DOWELL, Incorporated, and R. L. Ashcraft, Appellants,

v.

J. B. LYONS, J. W. Greene, and John F. Greene, Trading and d.b.a. Virgin Oil Company, Appellees.

No. 12799.

United States Court of Appeals
Sixth Circuit.

Dec. 5, 1956.

H. R. Wilhoit, Grayson, Ky., James H. Hanes, Tulsa, Okl., on the brief, for appellants.

J. W. McKenzie and Eldon L. Webb, Ashland, Ky., V. H. Redwine, Sandy Hook, Ky., for appellees.

Before ALLEN, MARTIN and STEWART, Circuit Judges.

STEWART, Circuit Judge.

This case arose out of an accident at an oil well in which certain equipment was destroyed by fire. A trial was had in the district court upon the appellees' complaint and the appellants' counterclaim. The jury found that the damage had been caused by the negligence of the appellants, and a judgment was entered against them. The issues here primarily concern the propriety of certain instructions which the district judge gave to the jury at the trial.

The appellants are engaged in the business of petrofracturing oil wells, a process in which a mixture of oil, sand and chemical is pumped under pressure into the oil-bearing sand at the bottom of a well for the purpose of increasing the flow of oil. There are two methods of conveying the mixture from the top of the well into the sand at the bottom: the tubing and packer method, by which the emulsion is injected through steel tubing inserted inside the well casing, and a packer is fitted against the walls of the casing at the bottom to prevent the emulsion from rising; and the casing method, by which the fluid is injected directly into the well casing itself. Under the first method, it is customary for the well owner to furnish both the tubing and the packer.

The appellees owned several producing wells in Elliott County, Kentucky, and they employed the appellants to petrofracture one of them. It was originally agreed by the parties that the job would be done by the tubing and packer method, but after operations were commenced, it was discovered that the emulsion was not penetrating the sand formation, either because it was too thick or because of an obstruction in the appellees' well. Accordingly, the work was stopped when the pressure got dangerously high.

After this unsuccessful attempt, the appellee well owners set out to remove the tubing and packer and to clean out the well in order that a second effort to petrofracture could be made. In the process the packer was broken so that it could not be used again. The appellees had no other suitable packer on hand, and it was subsequently agreed that the second attempt would be by the casing method.

In the original attempt to petrofracture the well the appellants' treating pipes had been connected to the top of appellees' tubing by means of a device called a swedge nipple. The threads on this swedge nipple, however, would not fit the larger diameter of the well casing. In preparing for the second operation, therefore, the appellants attempted to obtain a combination collar which would permit the attachment of the swedge nipple to the casing, but none could be found in the supply stores of the area. At the request of the ap-

pellants one of the appellee owners therefore borrowed an appliance from a neighboring oil well operator. It was a four-foot length of casing with a collar on one end. The differing diameters of its two ends permitted one end to be connected to the well casing and the other to be connected to the appellants' swedge nipple.

With this borrowed appliance in use, the petrofracturing operation was then commenced by means of the casing method, four days after the first unsuccessful operation. Since the well casing was of lap weld construction, which could not withstand as much pressure as seamless tubing, it was agreed in advance that not more than 2,000 pounds pressure would be applied. After about twenty minutes, the borrowed appliance ruptured causing a stream of oil to spurt against one of appellants' trucks. The heat from the truck engine caused the oil to ignite, resulting in damage to the equipment of both appellants and appellees.

There were pressure gauges on each of the appellants' pump trucks, and four witnesses, including one of the appellees, testified without contradiction that just before the accident, pressure of approximately 1,000 pounds was being applied. Moreover, although in the particular gear in which the appellants' pumps were being operated, a rise in pressure to as much as 1,500 pounds would have caused the truck motors to stall, the motors were still running and had to be turned off after the accident. It was thus clearly shown that the pressure at no time rose to more than 1,500 pounds, 500 pounds less than the 2,000 pound maximum which the parties had agreed to be a safe limit. The evidence also conclusively showed that this type of casing could withstand 2,300 pounds pressure if not in defective condition.

Nevertheless the district judge gave the following instruction to the jury: "It is not known here just what caused this equipment to break, whether it was not adequate or whether too great pressure was put on it or whether there was a stoppage of some kind in the material that brought about an excessive pressure." The jury were also instructed that, "It was the duty of the defendant company to see that no greater pressure was applied to that equipment than it would stand. * * * " These instructions were erroneous in permitting the jury to speculate upon the question of whether the appellants were negligent in applying excessive pressure. As the Kentucky Court of Appeals has stated, "[W]here the facts are undisputed, the issue to which they are directed is always one of law for the court and not for the jury to determine." Hopper v. Barren Fork Coal Co., 1936, 263 Ky. 446, 459, 92 S.W.2d 776, 783. These instructions were also clearly prejudicial. Obviously the immediate cause of the accident was the application of greater pressure than the particular defective equipment could withstand. The quoted instructions could therefore have been interpreted by the jury as tantamount to a direction to return a verdict against the appellants.

The district judge also instructed the jury that the appellants had a duty to exercise a higher standard of care than did the appellees in seeing to it that the borrowed appliance was adequate and safe for its intended use. This instruction was in our view also erroneous under the facts of this case.

The equipment which proved defective was essentially an ordinary piece of casing similar to that which was in appellees' well and with which the appellees were thoroughly familiar. It was not in any sense a device or tool within the exclusive or peculiar expertise of a petrofracturer. It was in fact borrowed by the appellees from another oil well operator. The appellee Lyons had been in the oil business for thirty-seven years and was familiar with petrofracturing operations. He knew that as much as 2,000 pounds of pressure might be applied to the equipment in question. Both parties made a visual inspection of the appliance and believed it to be satisfactory. The appellee Lyons himself testi-

fied that there was no visible indication of any defect. And, other than visual inspection, there was no practical method of testing the strength of the device available to either party at or near the well site.

It ordinarily would have been the duty of the appellants to have themselves supplied either a swedge nipple which would fit the diameter of the customer's well casing or a combination collar to enable the connection to be made, and to exercise care to see that the equipment was safe. But in this case it was originally agreed to use the tubing and packer method, and the appellants arrived at the appellees' well site properly equipped to perform the job by that method. Only after unforeseen difficulties, including the appellees' destruction of their packer, did it become necessary to switch to the casing method. After the appellants knew that the casing method was to be used, they made all reasonable efforts to obtain the needed combination collar through the supply houses in the area. After these efforts proved unsuccessful, it was explained to appellees that the job could not be done without one, and they were asked if they could get such a collar. It was then that the appellees borrowed the appliance in question.

The furnishing by appellees of the equipment under these circumstances was not gratuitous, but was for the business purpose of both parties. The appellees knew the precise use to which the appliance was to be put, and the pressure to which it was going to be subjected. They were chargeable with negligence if they failed to exercise reasonable care to see that it was safe for the use intended. See Restatement, Torts, §§ 391–92; Hilleary v. Bromley, 1946, 146 Ohio St. 212, 64 N.E.2d 832. The appellants were likewise chargeable with negligence if they failed to exercise ordinary care in carrying out their contract to petrofracture the appellees' oil well. See Prosser, Law of Torts, 481–82 (2d Ed., 1955), and cases collected therein. They were undoubtedly bound to a standard of conduct commensurate with the special knowledge acquired from their experience as petrofracturers. Northwest Airlines v. Glenn L. Martin Co., 6 Cir., 1955, 224 F.2d 120, 128; Prosser, Law of Torts, 132–34 (2d Ed., 1955). The appellees were similarly bound to a standard of conduct consistent with their experience as oil well producers. Upon these principles, each party was chargeable with the same skill and knowledge concerning the appliance in question. It was accordingly error to instruct the jury that the appellants should be held to a higher standard of care in this respect.

The judgment is set aside and the case is remanded to the district court for a new trial.